## Mott *vs.* The United States Trust Company.

A person who has borrowed money of a savings institution, upon his promissory
note, secured by a pledge of bank stock, is not entitled to an injunction to pre-
vent the prosecution of the note, on the ground that the savings bank was pro-
hibited by its charter, from making loans of that description

Where the charter of a savings institution provides that the funds shall be invest-
ed in, or loaned on, *public stocks,* or private *mortgages;* and that when loaned
on such stocks or mortgages, a sufficient bond, or other satisfactory personal
security, in addition, shall be required of the borrower, the promissory note of ·
the borrower, given to secure a loan, is perfectly lawful; and the fact that it is
not accompanied by the public stocks, or mortgage, required by statute, but is
merely secured by a pledge of bank stock, will not render it invalid.

Mott v. The United States Trust Company.

THIS was a motion for an injunction against the Trust Com-
pany, as receiver of the Knickerbocker Savings Institution,
to prevent the prosecution of a note made by Mott to the Sav-
ings Institution. Mr. Mott, one of the directors of the Knick-
erbocker Bank, borrowed $10,200 of the Savings Institution, on
the pledge of some shares of the Knickerbocker Bank Stock,
giving his note for the amount. He now moves the court for an
injunction prohibiting the defendant, as receiver, from prosecut-
ing said note, on the ground that the Savings Bank was prohib-
ited by its charter from making loans of such a description. He
also set up that the note was usurious.

C. O'Conor, for the plaintiff.

C. H. Hunt, for the defendant.

ROOSEVELT, J. This is a controversy arising out of the
incongruous alliance and subsequent very natural bankruptcy
of the Knickerbocker Bank and the so called Knickerbocker
Savings Institution. It illustrates in a manner calculated to
strike, and even to shock all notions of fair dealing, the tendency
of the one to prey upon the vitals of the other, and then upon
its own. The plaintiff, it appears, in his character of a member
of the Banking Association, on the 21st of March, 1854, obtained
from the funds of the Savings Institution—and it will be borne
in mind that the chief managers of the former, as the published
lists show, were trustees of the latter, and carried on their
operations in the same vicinity—a loan, so called, of $10,200,
payable with interest, on demand, substituting in the place of
the money so withdrawn from the Savings Institution his prom-
issory note and a certificate of 450 shares of the so called stock
of the Knickerbocker Bank. This loan, he now says, his friends
in the Savings Institution had no legal right to make, and he,
therefore, however much accommodated at the time, is under no
legal obligation to repay it ; and he accordingly files his bill in
equity—the conjunction can hardly fail to provoke a smile—
very modestly praying that the supreme court, sitting in its

character of chancellor, and as such, of course, the guardian of charities, will order the receiver, without payment, or any offer of payment, to deliver up the note and certificate—on the pretended faith of which, with the concurrence of the friendly managers of the charity, (unlawfully, as he contends,) he had abstracted of the savings of the poor the large amount of $10,000 and upwards ! The charter of the Savings Institution as amended in 1853, provides that its funds shall be invested in, or loaned on, public stocks or private. mortgages ; and that when loaned on—not invested in—such stocks or mortgages, " a sufficient bond or other satisfactory personal security in addition, shall be required of the borrower." A stock note, therefore, like the one in question, being a personal security in itself, was perfectly lawful ; and had the stock accompanying it been that of a " town, city, county or state," no question could have been raised as to either. What, then, is the proposition advanced by the plaintiff? That if, as required by law, he had given good collateral security, his personal promise to pay, thus fortified, would have been binding ; but having palmed off as collateral security a stock which was comparatively worthless, he cannot justly be called upon to pay any thing, and is equitably entitled to be shielded from all possible prospective annoyance—and that, too, it is said, is the legitimate and even necessary construction of a legal provision made, as the act expresses it, " for the interest and advantage of the depositors" —the poor and helpless and confiding depositors of an institution organized by the legislature to encourage, in the humble walks of life, the virtues of sobriety, industry, economy and integrity, and to provide for them a resource in seasons of want and distress ! The bare statement of the proposition carries with it, to my mind, its own refutation. It assumes as the law of a christian people a principle which could hardly be tolerated in a community of swindlers. The trustees of the Savings Institution—and Mott, the plaintiff, knew it—had undertaken an office of charity. They were " not to. receive, directly or indirectly, any pay or emolument for their services ; nor directly or indirectly to borrow its funds or deposits."

(§§ 3, 6.)   And they, like a board of guardians for minors, were to invest these deposits with a single eye to the interest and perfect security of the depositors.   The loan in question, therefore, under any interpretation of the charter, was a breach of trust—and Mott knew it, and co-operated in it, and may fairly be said to have instigated its perpetration.   He took the fund as a necessary consequence, charged with the trust—and so far from protecting him in his unlawful depredation, it is the duty of the court, on the contrary, to compel him to disgorge, and to account for whatever gains he may or might have made, by the unlawful mixing of the trust funds with his own, and employing them in his private business.   This is a familiar rule of equity jurisprudence—and it is an equally familiar rule that he who asks equity must do equity.   Before, therefore, calling for any interposition in his favor, the plaintiff must, at least, bring into court the principal and interest of the moneys which he admits he took from the vault of the Savings Institution—took, I say, because, although the faithless trustees may have been the willing instruments, it was he that handled them, and made them subservient to his purposes ; and it is he that would now, in more than one sense, take the benefit of the act.   What I have thus far argued assumes that the trustees were forbidden by this charter from making even a temporary disposition of the funds, except on the security of public stocks or real estate, an assumption, however, which it seems to me the language used, when taken in connection with other provisions, does not call for.   "To meet current payments" the trustees were authorized to "keep on deposit, on interest or otherwise, in such available form as they might direct, an available fund of not exceeding one hundred thousand dollars," &c.   Now a deposit, payable with interest, is neither more nor less than a loan ; and a certificate of such deposit, stipulating to return the amount with interest, it has been repeatedly and correctly held, is neither more nor less than a promissory note, engaging to refund such loan.   And if the note be payable on demand, and the maker be both able and honest, the deposit which it represents is obviously in the "available form" (to draw interest, and yet to be

ready to meet current payments,) which the charter contemplated. Kept in the form of gold and silver or bank notes, in their vault, it could certainly yield no interest ; and deposited on interest with a banking association, it would have no security other than the stock of the bank. In the present case there is both the stock of a banking association and the note of a single individual. A bank, even if the charter confined the trustees to making their available deposits in banks ; a bank, I say, under our laws may be organized by a single individual. "An individual banker," as he is denominated in the general banking law, may make himself president, cashier, clerks and directors, and carry his "office of discount and deposit" about his person. He may, in effect, as the law books express it, constitute himself a "corporation sole." And even a "banking association," it is provided, may be formed of "any number of persons," as few even as two. It is sufficient, however, for the purpose of the argument, to know that the charter, as to the fund referred to, imposes no express condition on the deposit, except that, while it may be in a "form" to draw interest, it shall be in a form that is "available ;" and no implied condition except such as results from the very nature of the trust. With these objects attained, and reasonable caution and good faith observed, it may be deposited with an individual, or with an individual banker, or with a banking association, or with a body corporate, "as the trustees may direct." In either "form" it is their duty to see to the sufficiency of the security, and in either form the careless or intentional taking of inadequate security, would be contrary to their duty, and, as a consequence, contrary to the charter. But to say that for that reason, the security taken—insufficient as it may be—is to be wholly given up and canceled, and the money left, and even protected, in the hands of the wrongdoer, and that by the active aid of a court of equity, is a proposition at variance, it seems to me, with every notion of common sense and common honesty. As well might it be said that if the trustees made loans to themselves which, as we have seen, they were prohibited from doing, the court, by way of redressing the injury, must release them from all obligation to pay. Or, taking

the case of ordinary private trustees, by deed or will, was it ever heard that a person borrowing money of them on note or other mere personal security, was entitled to turn round immediately and, without payment, ask a return of the securities? And yet all trustees, unless specially authorized in the will or deed to the contrary, are prohibited from making such loans. The wrong, in such cases, is a wrong done, not to the public, and to be punished by making the act void, but to the particular *cestuis que trust,* and to be redressed, as far as may be, by adding to the imperfect security, improperly taken, the individual liability of the trustees themselves, and by following, whenever it can be done, the very fund or subject of the trust in the hands of the knowing participator. When this cause comes to a final hearing, therefore—it has now been discussed only on an informal motion—the plaintiff, instead of being entitled to the decree he asks for, will be adjudged, by way of counterclaim, to pay to the receiver of the Savings Institution the whole $10,200, with interest and costs. If by his own showing, then, he is not entitled on a final decree to the relief he asks in his complaint, the rule is positive that he can have no claim to a preliminary injunction at the commencement of his action. The one is merely auxiliary to, and falls with the other. Motion to continue injunction denied, with costs.

[NEW YORK SPECIAL TERM, January 22, 1855. *Roosevelt,* Justice.]