| 43 | 13 |
| 88 | 312 |
| 43 | 13 |
| 89 | 653 |
| 43 | 13 |
| 118 | 598 |

---

GEORGE H. HAZLEHURST *et al.*, plaintiffs in error, *vs.* THE SAVANNAH, GRIFFIN AND NORTH ALABAMA RAILROAD COMPANY *et al.*, defendants in error.

1. A general demurrer will not be sustained if there be any equity in the bill.
2. It is not *ultra vires* for a railroad company, by its directors, to contract to issue to contractors for the completion of the road preferred stock in the company, in payment for work to be done, and to agree that a majority of the directors shall be the holders of a certain number of shares of said preferred stock; provided the number of shares agreed to be issued does not make the whole amount of shares greater than the capital stock authorized by the charter.
3. When a railroad company chartered to build a road from Macon to Brunswick (about two hundred miles) had completed fifty miles of the same, and had run the part completed for two years without any profit, and were wholly unable to complete the road, and the stock subscribed and paid in was only worth twenty cents on the dollar, and the company, at a general meeting of the stockholders, authorized the road to be

leased, or, on a failure of this, authorized the president and directors "to take any steps or use any means which they may deem best and most efficient to relieve the company from its present embarrassments, and this without calling any other meeting of the stockholders;" and the president and directors, failing to lease the road, made a contract with certain builders to complete one hundred and fifty miles of the line and agreed to give them in payment therefor certain first and second mortgage bonds and to issue to them certain preferred stock in the whole line, and to make the holding of a certain number of shares of said stock a qualification of a majority of the directors, and at the next meeting of the stockholders, the president stated to them that a contract to complete the road had been made, not going into particulars; but stating that the first and second mortgage bonds and the *preferred stock* was to be issued, but not undertaking to give anything more than a mere general synopsis of the contract, and there was no objection made by any of the stockholders, and the builders went forward and built the road and received the bonds and the stock :

*Held,* That it is too late for any of the old stockholders, after the contract has been executed, to complain that there were terms in the contract not disclosed to them, which, if they had known, they would not have consented to; there being no charge of concealment or deception, and the ignorance on their part being only the result of their own failure to examine the contract, which was open to their inspection.

4. When there was a contract between a certain railroad company and certain contractors, in which it was stipulated that the chief engineer of the company should be the arbiter to settle, in the first instance, any disputes as to the work, and it was also agreed that the contractors should have the proceeds of the running of the road as it was, mile by mile completed, until the whole was completed and accepted by the company, and the chief engineer and president of the company, eleven months before the time fixed for the completion and when the road was in many respects not completed according to the contract, accepted the road as finished, with a view of putting the whole road immediately at work for the company and completing the unfinished work with the proceeds, and his acts were shortly after reported to a meeting of the stockholders, who acquiesced in the transaction and continued for nearly a year to acquiesce in the running of the road and receipt of its earnings, it is too late for a small portion of the stockholders to complain of this action of the engineer, and to ask that an account be taken of the actual value of the work done, and that the builders be only allowed that value, especially if there be no offer to bring that value in money into Court.

5. The Macon and Brunswick Railroad Company has no power, under its charter, to purchase stock in another railroad, or to contract with others, for a consideration, to purchase the same and run it in the

Hazlehurst *et al.*, *vs.* The Savannah, etc., Railroad *et al.*

control of said other road for the benefit of the Macon and Brunswick Railroad. Such a contract is *ultra vires*, and the use of the State indorsed bonds, issued by virtue of the Act of 1871, is illegal, and any stockholder may come into equity to prevent it.

6. It is the right of any stockholder in the Macon and Brunswick Railroad to require the company to set aside the two per cent. sinking fund required by the Legislatures of 1865-6, on its indorsement of the bonds of the company; but it must appear, before a Court of equity is resorted to, that a fair effort has been made by the complainant, to procure this to be done by the company.

7. A Court of equity of this State will not enjoin non-residents of the State, who are not, and cannot be served with process, and who are outside of its boundaries, from doing acts of a personal character beyond the State lines and beyond the jurisdiction of its process, for contempt of its order. WARNER, J., dissents.

Equity. Injunction. Corporations. *Ultra Vires, etc.* Before Judge COLE. Chambers. Bibb County. March, 1871.

This cause was begun in Bibb county by a bill, the principal averments of which were as follows: The Savannah, Griffin and North Alabama Railroad Company, incorporated by the Legislature of the State of Georgia, for the purpose of constructing, building, equipping and running a railroad from the city of Griffin, in the county of Spalding, to some point on the line of the State of Alabama, in the county of Carroll; and which road is now in actual course of construction, with a roadway fully equipped, and regular trains running from the city of Griffin to the city of Newnan, a distance of thirty-six miles, and with a board of directors and other officers to manage and control its business operations, all appointed in compliance with its Act of incorporation, in order to fully carry out the purposes of its organization, and build and equip said road, accepted from the city of Macon, in the county of Bibb, (a body corporate and politic under the laws of the State of Georgia,) a subscription, *bona fide*, to the capital stock of the said Savannah, Griffin and North Alabama Railroad of $50,000 00, and then and there agreed to the condition upon which said subscription was made, to-wit: To receive in payment therefor fifteen hundred shares

of the capital stock of the Macon and Brunswick Railroad, a corporation also chartered by the Legislature of Georgia for the purpose of building, equipping and running a railroad from said city of Macon to the city of Brunswick, in the county of Glynn, and whose principal office is located in the city of Macon, in said county of Bibb, which said capital stock of the said Macon and Brunswick Railroad Company had been before that time duly issued to the said city of Macon, for so much money, viz: $100 00 per share, before that time actually paid in and contributed by the said city of Macon, and used by the said Macon and Brunswick Railroad Company in the building and equipping of said road, in payment of said subscription of $50,000 00 so made, and then and there received said fifteen hundred shares of stock in payment of said $50,000 00 subscription of the city of Macon to the capital stock of the said Savannah, Griffin and North Alabama Railroad Company; and then and there issued to the said city of Macon certificates of stock to that amount, and took a transfer from the said city of Macon to complainants of the fifteen hundred shares of stock in the said Macon and Brunswick Railroad Company in payment therefor. By means whereof complainant became, and was, and still is, the legal holder and owner of the said fifteen hundred shares of stock, and entitled to all the rights, privileges and immunities of a stockholder in said Macon and Brunswick Railroad Company.

And Andrew J. White, of the county of Pike, in said State, the owner and holder of two hundred and thirty-seven, or other large number of shares of stock in the said Macon and Brunswick Railroad Company which had *bona fide* been subscribed for and paid in to the treasurer of the said Macon and Brunswick Railroad Company, and afterwards duly transferred to him by the owners and holders of the certificates thereof; and Alexander M. Speer, of the county of Spalding, in said State, an original subscriber, holder and owner of seven shares of the capital stock of said Macon and

Hazlehurst *et al.*, *vs.* The Savannah, etc., Railroad *et al.*

Brunswick Railroad Company, paid in to the treasurer of said company at the rate of $100 00 per share, good and lawful money of the United States, also complain.

And thereupon, in behalf of themselves and all others of the original stockholders in said railroad, who may come in, and on proper terms be made parties complainant, they say, that all of said stock owned and controlled by them, as aforesaid, was subscribed and paid into the said Macon and Brunswick Railroad Company, by them, or those from whom they purchased, for the purpose of building and equipping a railroad from the city of Macon to the city of Brunswick, in the county of Glynn, and was used and employed by said Macon and Brunswick Railroad Company, in building and equipping said road to the city of Hawkinsville, in the county of Pulaski, a distance of fifty miles; and in grading the said railroad from Cochran's Station, in the county of Pulaski, a distance of seventy miles from thence, in the direction of Brunswick.

Said Macon and Brunswick Railroad was fully completed and equipped from the city of Macon to the town or place called Hartford, on the Ocmulgee river, opposite to the city of Hawkinsville, in November, 1865, and fully supplied with cars and motive power and all other conveniences necessary to its successful operation.

And, up to the period of time when said Macon and Brunswick Railroad was completed and equipped, as aforesaid, so as to run its trains through to Hartford, they have no reason to doubt or question that the expenditures for said road, and cost of its equipment, were made by its directors and officers in good faith to the stockholders, and with a view to their best interests. Said road as thus completed was as to its road-bed a first-class road and of fair equipment, sufficient for the business which it commanded. Said company, up to and during the war and at its close, was but very little in debt, and that debt being on the basis of Confederate money, and which has long since been paid off at a rate of from

twenty to thirty cents on the dollar in United States currency, leaving said company in the latter part of the year 1865, almost wholly free from debt of any kind. The President of said Macon and Brunswick Railroad Company, at the annual meeting of the stockholders thereof, held in the city of Macon, on the 6th of February, 1868, reported to said stockholders, that the entire indebtedness of said company, at that time, only amounted to the sum of $280,000 00; one half of that sum being a funded debt bearing only seven per cent. *per annum* interest, and the other half thereof being a floating debt, which he hoped speedily to extinguish *with assets on hand*, leaving only the funded debt of $140,000 00 existing as a lien upon said road. In a previous report made to the stockholders in annual meeting, on the 1st of February, 1866, the president had made an exhibit of the financial condition of said Macon and Brunswick Railroad Company, by which it appeared that the stock list amounted to not quite $800,000 00, in round numbers, and then added, in words, as follows, to-wit: "We have, then, for this sum of $800,000 00, a first-class road, fifty miles long, equipped and running, together with seventy miles additional ready for the iron rails, clear of debt or incumbrance of any description. Deducting $200,000 00 as cost of grading seventy miles, we have $12,000 00 per mile as the average cost of the fifty miles of running road; an extremely low figure for this description of road." The subsequent completion of the road from Hartford over into the city of Hawkinsville, together with its equipment, to meet increase of business, and the necessity of building a bridge across the Ocmulgee river at that point, three hundred and thirty feet in length, on substantial stone masonry, costing, for the entire extension from the point fifty miles from Macon, in road numbers, $100,000 00, accounts reasonably and properly for the amount of said company's indebtedness, as made known in said report of the president to the stockholders, on the 6th of February, 1868. At which time, also, the president congratulated the stock-

holders upon the great improvement in the condition and prospects of said railroad company since the war had closed. Contrasting its condition then, with its condition at the time of making said report, he said :

"At that time, (meaning the close of the war,) there remained near twenty miles of iron and the first engine on the road, unpaid for. This engine and two inferior ones, with half a dozen cars, constituted the sole rolling stock of the road ; an ordinary blacksmith shop furnished all the repairs for the same. The track and bridging was sadly out of repair, accidents being frequent from this cause, with few section houses, freight houses, side tracks, or other requirements of a road. Since then, the old debts have been paid; twelve miles of new rails have been purchased, the grading finished, the heavy bridge and trestle work across the Ocmulgee river and swamp finished, and the road extended into the town of Hawkinsville; good repair shops for engines and cars have been built in Macon ; section and warehouses put up on the line, the track almost entirely relaid with new timber, chairs and spikes supplied, the bridging renewed, five new engines and forty new cars have been added to the outfit. In fine, the road is complete, as to construction and equipment, no expenditure on these accounts being needed for the coming year, nor yet for some years to come, unless the road be extended."

Previous to this, 6th of February, 1868, to-wit :   On the 3d of December, 1866, there was an Act, approved by the Governor of the State of Georgia, which had been previously passed by the Legislature thereof, " entitled an Act to extend the aid of the State to the completion of the Macon and Brunswick Railroad, and for other purposes," of which the following is a copy, viz :

"*Whereas,* The Macon and Brunswick Railroad has been completed to the distance of fifty miles from the city of Macon, and is thoroughly equipped, and daily trains are running thereon, and seventy miles additional are graded and

ready for the superstructure; *and whereas*, its completion to Brunswick would greatly inure to the benefit of the State in developing its agricultural, commercial and manufacturing interests; *and whereas*, by reason of the financial embarrassments resulting from the late war, the stockholders of said railroad are unable to supply the capital necessary to the completion of this great work :

"SECTION I. *Be it enacted, etc.*, That his Excellency the Governor be, and he is hereby authorized to place the indorsement of the State of Georgia on the bonds of the Macon and Brunswick Railroad Company, which said company may issue, to the amount of $10,000 00 per mile, for as many miles of said road as are now completed, and the like amount per mile for every additional ten miles, as the same may be completed and placed in running order, on the following terms and conditions, to-wit: Before any such indorsement shall be made, the Governor shall be satisfied that as much of the road as the said indorsement shall be applied for, is really finished and in complete running order, and that the said road is free from all liens and mortgages, or other incumbrances which may, in any manner, endanger the security of the State; and, upon the further condition and express understanding that any indorsement of said bonds, when thus made, shall not only vest the title to all property of every kind which may be purchased with said bonds in this State, until all the bonds so indorsed shall be paid, but the said indorsement shall be, and is hereby understood, to operate as a prior lien or mortgage on all of the property of the company, to be enforced as hereinafter provided for.

"SECTION II. In the event of any bond or bonds, indorsed by the State, as provided in the first section of this Act, or the interest due thereon, shall not be paid by said railroad company at maturity, or when due, it shall be the duty of the Governor, upon information of such default by any holder of said bond or bonds, to seize and take possession of all the property of said railroad company, and apply the earnings of

said road to the extinguishment of said bond or bonds, or coupons, and sell the said road and its equipments, and other property belonging to said company, in such manner and at such time as, in his judgment, may best subserve the interest of all concerned.

"SECTION III. Repeals conflicting laws."

And the said Legislature of Georgia, afterwards, and before the indorsement, by the Governor, of any of the said bonds of the Macon and Brunswick Railroad, for the purpose of still further restricting the indorsement of the said bonds and the use thereof by the said railroad company, and the security of the State on account thereof, passed a resolution, which was approved on the 4th December, 1866, of which the following is a copy:

" *Whereas,* A bill has been passed at this session of the General Assembly, entitled 'an Act to extend the aid of the State to the completion of the Macon and Brunswick Railroad, and for other purposes;' *and whereas,* the said bill authorizes his Excellency| the Governor to place the indorsement of the State on the bonds of said company; *and whereas,* no limitations were fixed upon the terms of sale of said bond; therefore,

"*Be it Resolved,* That said company shall not sell or dispose of the bonds thus indorsed by his Excellency for more than ten per cent. discount, and the indorsement of the State upon the bonds of the said company shall not exceed $1,000,-000 00, until an amount of capital equal to the additional indorsement shall be *bona fide* subscribed and paid into said company.

" 2d. *Be it further Resolved,* That, in order more fully to secure the payment of the bonds of the said railroad company, it shall be the duty of said company to set apart, annually, two per cent. of the amount indorsed for, as a sinking fund, which shall be invested in State bonds and deposited with the Governor, to be held in trust for said company, and which shall be applied exclusively to the payment of the bonds of said company.

" 3d. *Be it further Resolved,* That his Excellency the Governor be authorized to withhold his indorsement upon the bonds of said company until the president and directors of said company give him written acceptance of the terms of these resolutions, and that these resolutions are received as explanatory of the bill extending the aid of the State to said Macon and Brunswick Railroad Company, and equally binding with said Act."

This Act of the Legislature, with the preamble and resolutions explanatory thereof, with all the terms and conditions of both the Act and resolutions, were accepted by the president and board of directors of said company; the object of said company, in procuring said indorsement of its bonds by the State of Georgia, was to build, complete and equip its said road through to the city of Brunswick, at such time as it could, upon proper terms, procure the means to do so by the aid of the State's indorsement.

It will thus be seen, by this retrospective view of the condition of said company, that, on the 6th February, 1868, its prospects were very flattering indeed. It, then, had a first-class road, completed and fully equipped, from Macon to Hawkinsville, with its track and bridges in first-rate order, with all necessary section and station houses; with engines, cars and machinery sufficient for all purposes, with a debt of only $140,000 00, running at seven per cent. per annum interest; with an Act authorizing the indorsement of its bonds by the State to the amount of $10,000 00 per mile of its completed road, and the same amount per mile upon every succeeding ten miles, as it should be completed and ready for the trains.

Owing to the low price of cotton, and the consequent depression occasioned thereby, together with anomalous political condition of the State of Georgia, rendering her bonds less valuable in the great money centres, it was not deemed advisable by the stockholders, at their meeting in February, 1868, to take any immediate steps looking to an early com-

pletion of their road; but, on the contrary, it was determined to "await the return of happier days." At this meeting the stockholders elected a Board of Directors for the ensuing year, consisting of George H. Hazlehurst, President; T. R. Bloom, Stephen Collins, B. F. Ross, N. McDuffie, George S. Obear, L. N. Whittle, Charles Day and J. A. Barclay.

At the next annual meeting of the stockholders, held on the 4th day of February, 1869, it was reported by the president that a contract had been closed with certain parties in New York, for the completion of said road; but without going into the particulars of said contract. He did not undertake at that time to give anything more than a mere general synopsis. He stated that the parties *known* in the agreement were Messrs. Hull and Miller, representatives of "strong capitalists" in New York city; that they had undertaken to furnish the entire graduation, masonry, bridging, trestle work, buildings and water stations; to furnish iron, chairs, spikes and cross-ties, lay the main track and sidelings, etc., and do everything else needed to put the road in successful operation; also, to meet the interest accruing on the bonds (meaning the State indorsed or first mortgage bonds) during the construction; and that the length of road thus to be constructed, was, in round numbers, one hundred and fifty miles. He further stated, that these contractors, Hull and Miller, were to receive for this work per mile, $10,000 00 of the first mortgage bonds of the Company, endorsed by the State, $6,000 00 of the second mortgage bonds, and $10,000 00 in stock rendered preferred in so far as being entitled to first earnings up to eight per cent. after interest in bonds and other expenses were met. He also went into an argument, with an array of facts and figures, to show that said contract was a very advantageous one for the company.

The real parties to this contract, the "strong capitalists," whom Messrs. Hull and Miller represented, were divers per-

sons and firms, (all of the individuals composing said firms being unknown to complainants) George D. Morgan, of the city of Boston, and the State of Massachusetts ; Dabney, Morgan & Company, M. K. Jessup & Company, S. L. M. Barlow, Morris Ketchum, D. Willis James, James R. Jessup, Foster & Thompson, J. S. Morgan & Company, James Godwin, L. P. Menturn & Company, J. Millbank, W. R. Garrison, W. H. Hays, and William H. Gray, all residents and citizens of the State and city of New York, who put forward Messrs. Hull and Miller as the parties to the said contract, when in truth and in fact, Hull and Miller were but the agents and confederates of said parties, the "strong capitalists," as aforesaid.

The terms and conditions of said contract with Hull and Miller, and these "strong capitalists," further than as reported by the president of the company, as hereinbefore set forth, were wholly unknown to them, and the great majority of the stockholders in said company, and has quite recently come to their knowledge, by seeing a printed copy of the same attached to the answer of the president of the company, to a bill filed by other parties, as an exhibit. A copy of said contract is attached.

By reference to this contract it will be seen that it was a most *extraordinay* contract, and in all its main features, much more favorable to the parties of the first part, to-wit: Hull and Miller and the "strong capitalists," than to the stockholders, whose money had built that portion of the road then in running order, and whose influence had obtained the State's indorsement of its bonds.

By the third paragraph, in section ... of said contract, it will be seen that it provides for the payment to said contractors of $1,500 000 00 of the preferred capital stock of said company, said stock to be entitled to dividends at the rate of eight per cent. per annum, before the common stock, to-wit: that held by complainants, and all other stockholders in said road, should receive any dividend whatever. By the eighth section it was further provided that all these securities, to-wit: second

mortgage bonds, and this eight per cent preferred stock, should at once be issued by said company, and placed in the hands of Dabney, Morgan & Company, as trustees, that said trustees should, upon completion of each section of ten miles of said railroad, obtain the indorsement of the State upon said first mortgage bonds, and that said trustees should then deliver the said securities, (first mortgage and second mortgage bonds, and eight per cent. preferred guaranteed stocks) to such persons as the parties of the first part (Hull and Miller,) in writing, should direct.

And it was further agreed, that a majority of the board of directors (in said Macon and Brunswick Railroad Company) shall each be the holder of *two hundred shares* of preferred stock, and that such directors should be elected as soon as there were parties qualified to serve, that is to say, as soon as Messrs. Hull and Miller, acting for these "strong capitalists," should order Messrs. Dabney, Morgan & Company, in writing, to deliver said eight per cent. preferred stock to themselves, or any other person belonging to "the ring" of "strong capitalists."

The board of directors, in these stipulations in said contract, exceeded their powers, and went beyond any authority conferred upon them by the charter or amended charters of said company. By so doing, they virtually provided for the appointment of a board of directors, composed of a majority who were non-residents of the State of Georgia, and whose interests were in conflict with the interests of the original stockholders in said road, and which majority, being thus the holders of said preferred stock, could control the management and the financial affairs of said company as they might desire.

By said stipulation in said contract, a great fraud was perpetrated upon the original holders of stock in said road, and in direct violation of the company's charter and amended charter, which provides that the stock in said road shall be so many shares, subscribed for and paid in, at $100 00 per

share. Whereas, this large amount of controlling, preferred stock agreed to be issued at once, was issued under said contract, without the payment of $1 00 into the treasury of the company, and, also, before any work upon said road, under said contract, amounting to $1 00 in value, had been done and performed by the said Hull and Miller, or the parties whom they represented; and, further, by the agreement between said contracting parties, said preferred stock, amounting to the sum of $1,500,000 00, was only estimated and valued at the sum of $300,000 00. And for this sum of $300,000 00, not paid in, but to be worked out by the said Hull and Miller and their confederates, after the issuing of the same by the president, they were to obtain a controlling majority of the board of directors in said company, in violation of the rights of complainants, and other original and *bona fide* stockholders, who had paid into the treasury of said company over $800,000 00 of its capital stock. If this part of said contract had been made known, as it should have been made known, to the stockholders in annual meeting, it would have been rejected; not having been brought to their knowledge, and approved by them, the board of directors had no right, under the charter, to make it, and the issuing of said stock, under the contract, and the controlling influence thereby bartered away, was, and is, absolutely void and of no binding force or effect upon said original stockholders, and was, and is, in legal contemplation, a fraud upon them, which is relievable only in a Court of equity.

This stock, thus illegally issued, has since, until the present time, been used by said Hull and Miller, and their confederates, in advancing their own individual interests, and in controlling and managing the affairs of said railroad in such a manner as to completely destroy the value of the old stock in said road in the markets of the country. In other words, the said "strong capitalists," have combined and confederated, together with the president and a few of the directors,

resident in the State of Georgia, to swindle the old stockholders out of their entire property.

By the 3d section of said contract, said Hull and Miller undertook and agreed to build said railroad as a single track, of five feet guage, with side tracks or turnouts not exceeding one thousand feet in every ten miles; the road-bed to be eighteen feet wide in the cuts, and twelve feet wide in embankments, with slopes of half horizontal to one perpendicular, in the cuts; the rails to weigh not less than fifty pounds per lineal yard; chairs to be wrought iron, with double lip, the whole length, and to weigh ten pounds each; spikes to be nine-sixteenths of an inch square, by five inches long; cross-ties to be six by eight inches and nine feet long, and laid two feet three inches, from centre to centre.

And by the 4th section of said contract, said contracting parties further agreed to build over the Ocmulgee river, at the crossing thereof, a substantial Howe truss bridge, with stone piers and abutments, (faced with rubble work,) said piers to be founded upon timber cribs, built up to low water mark, and filled in and surrounded with loose stone, in the usual manner; and over all other streams and depressions where needed, trestle bridges, on piles driven into the swamp a sufficient depth to insure a solid foundation.

And, by the 5th section, it was further agreed, that the line should be provided with a good wooden water tank for every twenty miles in length of the main line, and depot buildings, platforms and wood sheds, to be erected where necessary, in accordance with the plans and directions of the chief engineer of the party of the second part; the entire cost of all such buildings and tanks not to exceed $20,000 00, upon the road to Doctor Town; and $30,000 00, if completed to Brunswick, and the places where such depots are to be erected, shall be determined by the said parties of the first part. "All work to be done in a substantial manner, and to the satisfaction of the chief engineer of said railroad company."

By the first paragraph of the eleventh section of said contract, it was agreed, that, until the whole of said railroad, agreed to be constructed, or any portion thereof, should be delivered to the company, the net earning upon such completed portion should be paid over to the trustees thereinbefore appointed.

And by the second paragraph of the same section, it was provided, that the interest upon the bonds of said railroad company, delivered to the parties of the first part, to-wit: Hull and Miller and their confederates, should be paid by the said Hull and Miller.

If complainants and the other stockholders in said company had known and approved of this entire contract, they had a right to expect that it would be carried out in good faith by the other contracting parties, and that the President and chief engineer of said railroad company would compel them so to do.

The Savannah, Griffin and North Alabama Railroad, expressly charges that the stock so taken by it, from the city of Macon, in payment for its own stock, was taken upon faith of the representations made by the president of the said Macon and Brunswick Railroad Company, that it was a good contract, and would be executed in good faith, and with the hope of selling said stock again, to provide the means for the completion of its own road; and but for said representations, and the confident belief said contract would be carried out in good faith, A. J. White would not have purchased said stock, held by himself in said railroad.

Whereas, said road-bed was not made according to contract, eighteen feet wide in the cuts, and twelve feet wide in the embankments ; the cuts in many places were scarcely wide enough to admit the passage of the trains, and entirely deficient in the usual and customary drainage to carry off the surplus water; the embankments in no place exceeded the width of the cross-ties, and in many places the ends of the cross-ties protruded over beyond the embankments at both

ends; the slopes in the cuts were not made as stipulated in the contract, but much steeper, and more liable to cave, than if as provided; the rails, chairs and spikes in some places, were of a quality inferior to that required by the contract; the cross-ties were gotten out of small pine trees, scalped on two sides, and laid without regularity, and many of them so worthless as to be rotten and unfit and unsafe to run trains over in twelve months after they had been put down; the side tracts or turnouts, not exceeding one thousand feet in every ten miles, were not provided according to said contract; the bridges across the Ocmulgee river, at the crossing thereof, was not of the substantial and durable character provided for, but cost much less by several thousand dollars than it should have cost according to the provisions and stipulations in said contract; substantial trestle bridges, "on piles driven into the swamp, a sufficient depth to insure a solid foundation," were not provided, over small streams and depressions where water had to be crossed, but on the contrary, in many such places along the line of said road, worthless temporary bridges made in the rudest and simplest manner, of pine logs cut green from the forest, and laid end to end, with cross-ties on top to support the iron rails, without any solid foundation whatever, were constructed in reckless disregard of said contract, and of the lives and limbs of persons to be transported over said places by the trains of said company. And, in many places where embankments were necessary, these worthless, rude and dangerous pine bridges, were substituted in place thereof, costing very much less than a proper embankment.

Said road, instead of being graded and completed continuously from end to end, so that it might be used, was graded and completed in broken sections, not connected together so as to admit the passage of trains; and while thus in broken sections was reported to the State authorities as a completed road, the bonds indorsed by the State issued for such sections

at the usual rate per mile, and the interest thereon, commenced to run.

Previous to the time when the trains ran over said road through to Brunswick, the precise date being unknown, these holders of the fraudulent preferred stock issued to them, were, by virtue of said stock, created directors in said company; and being a majority of the board of directors, dictated and controlled its entire management; and, with the aid of their confederates or agents, Hull and Miller, hurried up the work, so as to get the iron rails laid down continuously through to Brunswick, some eleven months earlier than they had contracted to do; and instead of building a first-class road, ready for immediate business, and a substantial, durable road, it was not even a third-class road, but fell far short of the contract in every respect, and was not only unsafe, but absolutely dangerous as a highway of travel; running off of trains, misconnections, and smash-ups, were of daily occurrence. In many places, in the cuts, and for want of proper and necessary drainage, the water stood upon the track, and the passing of heavily laden trains, caused the cross-ties to sink into the mud, so as to bury the iron rails beneath the surface of the earth.

In this unfinished and unsafe condition, it was received from said contractors as being fully completed according to contract. This was done by a combination and confederacy between the president and board of directors, to defraud the stockholders and holders of the old *bona fide* stock, or dictated and compelled, by the majority of the board, who were the holders of the fraudulent preferred stock, and the beneficiaries of this gigantic fraud. For, by this acceptance of the road in its then condition, the expense attendant upon its completion as a first-class road, was shifted from the contractors to the corporation itself; and not only that, but the interest accruing upon the State indorsed bonds which the contractors had agreed to provide for until the completion of the road, had also to be assumed and paid for by the cor-

poration. It is true that the terms of the contract provided that the net earnings of that part of the road completed by these contractors, should be paid over to the trustees, for their use, until the road was turned over by them to the company; and in surrendering the road, of course it will be contended that they surrendered also these net earnings as a compensation for the interest to accrue upon the State indorsed bonds; but the net earnings of said road during the past year, have not been sufficient to complete the same as a first-class road, and pay the interest upon said bonds. And the loss for damages to trains in runing over a defective road, by running off, and other causes, has amounted to a very large sum.

Since the said "strong capitalists" have been made direc-rectors, by virtue of their being the holders of said so-called preferred stock, they have seen fit to buy *five thousand*, or other large number of shares of stock, in the "Macon and Western Railroad Company," paying therefor in Macon and Brunswick State indorsed bonds; a purchase made on their own private account, in which the said Macon and Brunswick Railroad Company had no interest; the stock was not bought by them for said road, nor will it receive one dollar of the dividends accruing upon the same. And yet it seems that said directors, residing in New York, in connection with Charles Day, a Georgia director, temporarily sojourning in New York city, held a meeting of said board of directors, *in New York city*, some time during the past summer, and then and there passed a resolution voting to themselves, as the purchasers of said five thousand shares of "Macon and Western Railroad stock," and as a compensation for such purchase, $200 000 00, of what they were pleased to designate "income bonds" of the Macon and Brunswick Railroad Company, and then and there, from their office in New York city, directed the president and treasurer of said company in Georgia, to issue such "*income bonds*" to M. K. Jessup and others, members of said board of directors. And said bonds

have been issued, and are now outstanding as a part of the, *prima facie*, existing indebtedness of said road, and also, to be paid in preference to any claim of any other holder of the original stock of said company.

During the past session of the Legislature of the State of Georgia, and after said Macon and Brunswick Railroad Company had been for several months running its trains through to Brunswick, said New York Board of Directors, aided and assisted by George H. Hazlehurst, the president thereof, and against the protest, and in spite of the opposition of A. J. White, and at considerable cost to said company, succeeded in procuring the passage of a bill, which was approved by the Governor, granting additional aid to said Macon and Brunswick Railroad of $3,000 00 per mile, amounting in the aggregate to about $600,000 00, when there was no necessity for any such aid, if aid it may be called, as it was but a bill to increase the indebtedness of said road $600,000 00, without any corresponding benefit, except it might be to confer a gratuity upon the holders of the fraudulent preferred stock aforesaid, and thus increase their profits, at the expense of the other stockholders in said road. For the only legitimate effect of the issue of said bonds, as a debt, and a first mortgage debt, would be to still further depreciate the value of their stock, if such a thing were possible.

It was represented to a committee of the Legislature, in order to procure the passage of the Act aforesaid, that the $600,000 00 additional State indorsement of the bonds of said railroad was wanted for the purpose of paying off $1,100,000 00 of the second mortgage bonds of said company, and that it would be so used; whereas, it was never the intention of said parties, controlling said railroad, to extinguish any portion of said debt held by themselves, but to retain said second mortgage bonds, and to obtain and hold said $600,000 00 of the State's additional indorsement of the bonds of said company for their own use and benefit, to the exclusion of the other stockholders in said railroad. The

issuing of said bonds by the president of the company, and their indorsement by the treasurer of the State would be another great fraud upon the rights of complainants, in the premises, and form an additional link in the great chain of frauds perpetrated upon the original stockholders, since the contract for the completion of said railroad was entered into, by the board of directors, with Hull and Miller, and their principals and confederates.

The provisions of said Act, and resolutions explanatory thereof, of December 3d, 1866, granting aid to the said railroad, which provided that said company should set apart, annually, two per cent. upon the amount indorsed by the State, and deposit the same with the Governor of the State, as a sinking fund for the payment of said bonds, have not been complied with, as, in equity and good conscience, they should have been. Said board of directors and holders of of preferred stock, in their greed for gain, have overlooked the rights of the State of Georgia, under that Act, as well as the rights and interests of complainants. And while their failure to comply with that provision does not jeopardize the interests of the State—the road, with its equipment, being ample to indemnify the State for its liability as indorser—yet, it does jeopardize the interests of complainants, and renders their chances for getting dividends in the far distant future, still more remote and uncertain.

The liability of said railroad, *prima facie*, as it now exists, is about as follows:

First mortgage State indorsed bonds ........................$1,950,000 00
Second mortgage bonds ............................................ 1,100,000 00
Eight per cent. guaranteed stock............................... 1,500,000 00
Additional State aid.................................................... 600,000 00
"Income bonds," issued by order of New York directors, and all in the hands or control of said Hull and Miller, or "strong capitalists" in New York........................ 200,000 00

Total.................................................................$5,850,000 00

Taking the estimates of the president of the company, who made the contract with these parties for the completion

of said road, this amount of the company's liability was only rated at the following sums, leaving out fifty miles of completed road at the time said contract was entered into; and estimating the State bonds turned over to them, in round numbers, at $1,500,000 00, we arrive at the following:

| | | |
|---|---|---:|
| $1,500,000 00 | State indorsed bonds, at 90 cents | $1,500,000 00 |
| 1,100,000 00 | second mortgage bonds, at 50 cents | 550,000 00 |
| 1,500,000 00 | eight per cent. preferred stock, at 20 cents.. | 300,000 00 |
| 200,000 00 | income bonds, at 00 | 000,000 00 |
| 600,000 00 | additional State aid, at 00 | 000,000 00 |
| | | $2,350,000 00 |

Add to this the amount of State's indorsed bonds, for the fifty miles of completed road before the contract was entered into, and we have the sum of......................  500,000 00

$2,800,000 00

As the legitimate indebtedness of said road, which, together with the amount of original stock, $800,000 00, will show us the actual cost of its building and equipment, viz:..........................................  800,000 00

Making the total actual cost........................................$3,650,000 00
    instead of...............................................$6,150,000 00.

If the holders of said fraudulent, so-called preferred eight per cent. guaranteed stock are permitted to continue in the management and control of said railroad, the interests of complainants therein will be entirely destroyed, and irreparable injury will be the result to them, as well as to all the other holders of stock, other than the holders of the so-called preferred stock in said company.

In addition to the great advantages accruing to the said Hull and Miller and their principals, as aforesaid, under that part of said contract already referred to, it was further stipulated and agreed, that said Macon and Brunswick Railroad Company should use every effort to obtain donations of land and other property from the City of Brunswick, the Brunswick Land Company, the Canal Company, and the various land owners in and near the city of Brunswick; which property was to be conveyed to the trustees, as thereinbefore

appointed, (Dabney, Morgan & Company,) for the benefit of said Hull and Miller, thereby transferring and agreeing to transfer to said Hull and Miller, and the parties whom they represented, all the material and substantial advantages accruing to said company from a completion of their road to Brunswick, other than the value of freights over said railroad.

Prior to the making of said contract, the city of Brunswick had made a subscription to said road of $300,000 00 of its bonds, contingent upon the completion of the same from Brunswick to section number seven, on the Atlantic and Gulf Railroad; and also depot grounds, to the extent of thirty acres in the heart of the city of Brunswick, with an avenue of one hundred and fifty feet in width, opened through the city limits, for the passage of the railway tracks to the deep water of the bay. All of which magnificent donation, except the mere trackway through the city, has been transferred from the company to the said Hull and Miller and their confederates. What other donations they may have received since the making of said contract, and likewise transferred to said parties, is unknown, and on this point they pray a discovery of the facts.

Either the blindest folly, the most ignorant stupidity, or the grossest fraud on the part of the agents and officers of said company, must have induced them to make such a contract; whether it was the result of either ignorance or fraud on their part, the advantages which the said Hull and Miller and their confederates have obtained thereby, are inequitable and unjust to complainants.

The president and board of directors in said railroad company, have betrayed the trust reposed in them, and never, since the signing of said contract for the completion of said road, have, in good faith, represented the interests of the old *bona fide* stockholders therein, but have combined and confederated with the parties hereinbefore named, to defraud complainants out of their entire interest in said railroad.

Many other illegal and fraudulent acts have been done and performed by said board of directors, since by the issue of said preferred stock, the management of the affairs of said corporation was thus illegally and fraudulently taken away from the old stockholders and transferred to them; but owing to their having all the books, papers, accounts and documents of every kind relating to the management of said railroad in their possession, and beyond the reach of complainants, they cannot at this time specify more particularly without a discovery from said defendants.

In view of the facts aforesaid, it is necessary that the affairs of said corporation be wound up and settled, and an account taken between complainants and the said defendants, and a distribution had of the assets thereof among all persons legally entitled to a participation therein.

. In consideration whereof, they prayed injunction to be directed to George H. Hazlehurst, President, and to C. S. Dabney, J. P. G. Foster, M. K. Jessup and J. Millbank, of the State and city of New York, holders of said so-called preferred stock, and by virtue thereof directors in said railroad, restraining them, and each and every of them, by themselves or their agents, from all further control or management of said railroad, or interference with its management or control until the further order of this Court; and to appoint some fit and proper persons to take charge of the said Macon and Brunswick Railroad, together with its cars, engines, and machinery, property and effects of every kind and to invest him with all the powers, and to require of him to perform the duties and assume the responsibilities of a Receiver of this Honorable Court, to manage and control said railroad, run its trains and transact all legitimate business, in the interest and for the benefit of all parties concerned, until the further order of this Court, and to restrain the officers of said company from the issuing of the additional bonds of said company, to the amount of $600,000 00 for the purpose of procuring the State's indorsement there-

on, in compliance with the Act of the Legislature at its recent session in 1870; or if said bonds have been already issued and not indorsed, to enjoin N. L. Angier, the Treasurer of the State of Georgia, from placing the State's indorsement thereon, until further order of this Court; that the said Hull *et al.*, may be enjoined from negotiating, selling or transferring the said second mortgage bonds of said company, the said so-called eight per cent. preferred stock of said railroad company, the $200,000 00 of so-called "income bonds" of said company, and, if issued and indorsed to them, the said $600,000 00 of the road's State indorsed bonds, authorized by the last Act of the Legislature, as aforesaid, and that they may also be enjoined from any and all interference in the management of said railroad, or its affairs, until the further order of this Court.    It propounded questions to Hazlehurst only.

The final decree prayed for was as follows :

1st. That said $1,100,000 00 of the said second mortgage bonds of the said Macon and Brunswick Railroad Company, in the hands or under the control of said parties, defendants hereto, or either of them, or their agents and confederates, be cancelled and delivered up, and that they receive, in a general account and settlement, the sum of $550,000 00, in lieu thereof, in money, with interest thereon from the time when the amount represented by said bonds became actually due and payable for work done by them upon said railroad.

2d. That said $1,500,000 00 of said preferred stock, or so much thereof as may be held by the said defendant, or either of them, be also cancelled and delivered up ; and that they receive in lieu thereof, in a general account and settlement, the sum of $300,000 00, and no more, for the whole of said stock, or *pro rata*, for a less amount in money, with interest thereon from the time when said sum of money became actually due and payable for work done, or materials furnished by them, for the use of said railroad company.

3d. That said so-called "*income bond*," for the sum of

$200,000 00, may be delivered up, cancelled and declared void; or if sold or transferred to a *bona fide* holder for value, by the said defendants, that they, the said defendants, may account to said company for the total amount of said company's liability on account thereof.

4th. That said State indorsed bonds, under the authority of the Act of 1870, may be perpetually enjoined from issuing; or if issued and not yet indorsed, that the treasurer of the State of Georgia may be perpetually enjoined from placing the State's indorsement thereon; or if issued and indorsed, that the said defendants may be perpetually enjoined from using, transferring or negotiating them; or if issued, indorsed and negotiated, that they may account to and with said company, in a general settlement, for the amount of said company's liability on account thereof.

5th. That said Dabney, Morgan & Company, as trustees, may account to and with said railroad company, in full, and upon a full, fair and complete exhibit of all their actings and doings as such trustees; that they may account to and with said company for any and all balances found to be remaining in their hands, as such trustees, and for all damages or losses that said railroad company may have sustained, by reason of the complicity of said trustees, or either of them, in the illegal and fraudulent transactions hereinbefore set forth and charged.

6th. That said Hull and Miller *et al.,* may jointly and severally account for all State indorsed bonds, second mortgage bonds, preferred stock, income bonds, money, bills, notes, or other assets of any and every kind and description, belonging to said Macon and Brunswick Railroad Company, or at any time under the control of said railroad company, which may have, at any time, been paid to, or gone into the possession or control of them, or either of them, under and by virtue of said fraudulent contract, or in consequence of any transaction growing out of said contract; that an account may be taken, under the direction of the Court, and an esti-

mate made, showing the difference in the cost of the construction of said railroad as a first-class, finished, and completed road, and as it was in its unfinished and incomplete condition at the time of its delivery by them, or their agents, to George H. Hazlehurst, president, and its acceptance by him, as president; and that they, the said defendants, may be decreed to account to and with said company for said difference in value.

7th. That, upon said accounting and settlement being had, if anything be found to be justly and equitably due and owing to said defendants, such a decree may be rendered as will fully secure to them all their rights and interests in said railroad company, and at the same time fully secure and protect the rights and interests of all other of the original and *bona fide* stockholders in said company.

The contract alluded to was as follows: "This agreement, made this, the 25th day of June, 1868, between George G. Hull, of the city of New York, and Sidney G. Miller, also of the city of New York, parties of the first part, and the Macon and Brunswick Railroad Company, a corporation, created by and under the laws of the State of Georgia, of the second part:

"1st. Witnesseth, that the parties of the first part, in consideration of the covenants hereinafter contained, to be kept and performed by the party of the second part, hereby agree to build and construct the unfinished portion of the Macon and Brunswick Railroad, from the present *terminus* of the main line, in Pulaski county, to the city of Brunswick, Georgia, a distance of about one hundred and forty-seven miles, and to complete the same before the 1st day of January, 1871.

"2d. It is further agreed, that the route to be adopted for the line shall be the same as that now proposed by the engineer of the party of the second part, and shown upon his plans and profiles, and marked red on the map of the State of Georgia hereto annexed, and crossing the Atlantic and

Gulf Railroad at or near Doctor Town; the line, however, to be subject to such modifications and changes as may be deemed necessary by the party of the second part in making their final location, provided that the cost of construction is not increased thereby.

"3d. It is further agreed, that the said railroad shall be a single track, of five feet guage, with side tracks or turn-outs not exceeding one thousand feet in every ten miles. The road-bed to be eighteen feet wide in the *cuts* and *twelve* feet wide on the embankments, with slopes of half horizontal to one perpendicular in the cuts. The rails to weigh not less than fifty pound per lineal yard. Chairs to be wrought iron, with double lip the whole length, and to weigh ten pounds each. Spikes to be nine-sixteenths inch square by five inches long. Cross-ties to be six by eight inches, and nine feet long, and laid two feet three inches from centre to centre.

"4th. A substantial Howe truss bridge to be built over the Ocmulgee river, at the crossing thereof, with stone piers and abutments (faced rubble work)—said piers to be founded upon timber cribs, built up to low water mark and filled in and surrounded with loose stone in the usual manner; and over all other streams and depressions where water may be needed, trestle bridges, on piles driven into the swamp a sufficient depth to insure a solid foundation.

"5th. The line to be provided with a good wooden water tank for every twenty miles in length of main line; and depot buildings, platforms and wood sheds to be erected where necessary, in accordance with the plans and directions of the chief engineer of the party of the second part; the entire cost of all such buildings and tanks not to exceed $20,000 upon the road to Doctor Town, and $30,000 if completed to Brunswick; and the places where such depots are to be erected shall be determined by the parties of the first part. All work to be done in a substantial manner and to the satisfaction of the chief engineer of the party of the second part.

"6th. And it is further agreed, that the party of the second part shall pay to the parties of the first part, for the building of said railroad and the buildings thereon, as hereinabove provided, as follows:

"1st. $1,500,000 00 of the first mortgage bonds of the Macon and Brunswick Railroad Company, payable twenty years after date, with interest at seven per cent., payable half yearly, and indorsed by the State of Georgia. The whole issue of said bonds being $1,950,000 00, principal and interest, payable in the city of New York.

" 2d. $1,000,000 00 of the second mortgage bonds of the Macon and Brunswick Railroad Company, payable fifteen years after date, with interest at seven per cent., payable half yearly, both principal and interest payable in the city of New York. The whole issue of said bonds limited to $1,100,000 00, and the trustees of said mortgage shall be James G. Goodwin and Samuel A. Strong.

"3d. $1,500,000 00 of the preferred capital stock of the Macon and Brunswick Railroad Company, such stock to be entitled to dividends at the rate of eight per cent. per annum, before the common stock shall receive any dividends, if earned in the current year, but not otherwise; and if the earnings of the road are sufficient to pay more than eight per cent. dividends on both preferred and common stock, then such earnings shall be divided equally between preferred and common stock in the proportion of the actual amount of the two classes of stock; and any stock dividend that may be made upon the said stocks shall be divided as well upon the preferred as the common stock, and the amount of the preferred stock shall be limited to $1,500,000 00, and the amount of common stock shall be limited to $1,750,000 00.

" 7th. And it is further agreed, that the party of the second part, shall, if possible, procure aid from the State of Georgia, either by indorsement of second mortgage bonds or subscription to preferred stock, or in some other manner, and shall, also, if possible, procure agreements from the Macon

and Western Railroad Company and the Atlantic and Gulf Railroad Company, to receive in payment of balances due to them by the Macon and Brunswick Railroad Company, to the amount of not less than $250,000 00, each, of the second mortgage, unindorsed bonds, hereinabove agreed to be paid to the parties of the first part. The same to be absorbed within thirty months from the completion of the road to Doctor Town. And it is further agreed, that the party of the second part shall procure all the land necessary for the right of way and depot grounds, and pay for the same.

"8th. And it is further agreed, that all of the above securities shall be at once issued by the company, and placed in the hands of Dabney, Morgan & Company, as trustees. The said trustees shall, upon completion of each section of ten miles, obtain the indorsement of the State upon said first mortgage bonds, and the said trustees shall deliver the said securities to such persons as the parties of the first part, in writing, shall direct, upon the estimate of the chief engineer of the said party of the second part. And the party of the second part hereby agrees to obtain the indorsement of the State upon such bonds, on the requisition of Messrs. Dabney, Morgan & Company.

"9th. If any disagreement or question in dispute should arise between the parties of the first part and the chief engineer, in reference to any of the matters embraced within the terms of this contract, the same shall be referred to two disinterested persons, to be selected, one by each of the aforesaid parties, and these two referees, if unable to agree, to choose a third, and the decision of these three referees shall be final. And it is further agreed, that payments shall be made monthly, as the work progresses, on the estimate of the chief engineer of the company of the amount of work done, and the materials delivered. The rails, chairs and spikes to be considered delivered when landed on the wharf at Savannah or Brunswick.

"10th. And it is further agreed, that, if said parties of the

first part shall fail to complete the said railroad to the city of Brunswick, but shall complete it to its intersection with the Atlantic and Gulf Railroad, they shall not be liable for any damages for non-fulfillment of contract, and shall receive in payment of work done a proportionate amount of the said securities, such proportion to be estimated according to the number of miles completed to the entire length proposed to be constructed, provided that the party of the second part is notified, on or before the 1st day of January, 1869, whether the parties of the first part will build the road from Doctor Town to Brunswick, and if they elect so not to do, the securities placed in hands of trustees to pay for the construction of that portion of the road shall be returned to the party of the first part.

"11th. And it is further agreed, that, until the said railroad herein above agreed to be constructed, or any portion thereof, shall be delivered to the party of the second part, the net earnings upon said portion shall be paid over to the trustees above appointed. And it is further agreed, that, until the completion of this contract, the interest upon the bonds of the party of the second part, delivered to the parties of the first part, as hereinabove provided, shall be paid by the said parties of the first part. It is further agreed, that the party of the second part shall furnish engines and cars necessary for prosecuting the construction of the work, without charge, and shall also pay all charges for transportation of laborers, materials, and supplies used in construction, over the Atlantic and Gulf Railroad.

"12th. And it is further agreed, that the party of the second part shall provide that a majority of the board of directors shall each be a holder of two hundred shares of preferred stock, and such directors shall be elected as soon as there are parties qualified to serve. And it is further agreed, that the said Macon and Brunswick Railroad Company shall not increase the bonded debt of the company by a further issue of bonds, or increase the common or preferred stock, except by

consent, in writing, of a majority in amount, of the holders of the preferred stock. And it is further agreed, that this contract shall not be binding upon the parties of the first part until the party of the second part shall have paid all its existing floating debt.

"13th. And it is further agreed, that the parties of the first part will purchase from the party of the second part, three thousand six hundred tons of iron rails, now at the city of Brunswick, belonging to the party of the second part, and hypothecated to Dabney, Morgan & Company, at the price of $75 00 per ton, currency, duty paid at Brunswick, and shall pay for the same on the execution and ratification of this agreement by the President and Board of Directors of the Macon and Brunswick Railroad Company, and the party of the second part hereby agrees to sell the said three thousand six hundred tons of iron rails, at the price aforesaid.

"14th. And it is further agreed, that the party of the second part shall use every effort to obtain donations of land and other property from the city of Brunswick, the Brunswick Land Company, the Canal Company, and the various individual land owners in and near the city of Brunswick, which property shall be conveyed to the trustees, as hereinbefore appointed, for the parties of the first part, or their assigns."

The Chancellor granted an injunction to take effect as soon as the defendants were served, and to last until the hearing before him, and ordered them to show cause why this injunction should not be made perpetual and a Receiver be appointed. He ordered service on the non-residents to be perfected by publication for eight weeks in a public gazette, or by personal service of a copy of the bill. Hazlehurst was regularly served, Hull & Ketchum were served in this State, and the balance in New York, etc., but by unofficial persons, who made affidavit to such service.

After this, complainants amended the bill, as follows:

And complainants pray that said Macon and Brunswick

Hazlehurst *et al.*, *vs.* The Savannah, etc., Railroad *et al.*

Railroad Company may be made a defendant to said bill, and that said company answer the same; and further charge (upon information and belief,) that, at or about the time of the making the said contract with said Hull and Miller and their associates, as stated in said bill, said president and directors of said company, for purposes unknown, and to an extent also unknown to complainants, but of which they pray discovery, issued the stock of said company, called common stock, in contradistinction to said preferred stock, to the amount of $1,500,000 00, or other large sum, and transferred the same, or a large portion thereof, to said Dabney, Morgan & Company, or to their confederates, or both defendants, as aforesaid, but without having the same issued and paid for, as required by the charter of said corporation, and as stipulated for in the said resolution of said Legislature of the State of Georgia, of the 4th day of December, 1866; but said stock was not paid for or agreed to be paid for at its par value, but the consideration pretendingly paid, or stipuated to be paid therefor, was both inadequate and illegal. Illegal in this, that the same was paid to said Dabney, Morgan & Company for interest on railroad iron purchased from them for said road, at an exorbitantly usurious rate of interest, and inadequate, and not amounting as a *bona fide* payment to more than twenty cents in the dollar, or other inadequate sum. And they pray that said Dabney, Morgan & Company, and their confederates, the holders of said stock, may be enjoined from the transfer of said stocks until further order, and that an account be taken as to said stocks, with said Dabney, Morgan & Company and their confederates, defendants, and holders of said stock, and that the same be rendered up and cancelled; and that said corporation, so illegally and fraudulently in the hands of and under the control of said Hull and Miller, and their confederates, as charged in said original bill, may be enjoined by itself, its directors, agents and officers, from the transfer of said stocks,

or any share thereof, from and to any one on the books of said company, until further order.

And, in like manner, that said corporation, its officers and agents, be enjoined from the transfer on the books of said company of any of said preferred stocks from or to any one, until further order.

And complainants further charge, that, for as much as said defendants, the holders of said preferred and common stocks so illegally and fraudulently issued, are non-residents of the State of Georgia, have no appearance in this cause, and complainants can have no adequate redress against them except by getting control of them through their assets in the State of Georgia, and said stocks are the only property or assets known, claimed by them within this State, complainants apprehend that, unless immediately restrained from the transfer of such stocks, hereafter, on final decree, the relief which may be decreed will be greatly impaired or wholly lost.

That the said Macon and Brunswick Railroad Company may be enjoined and restrained from paying said income bonds, or any interest thereon; that they may be restrained from paying any dividends on the said preferred stock, and that the same may be declared fraudulent and void; that said president and directors may be enjoined with the officers and agents of said company, from transferring on the books of said company the said preferred stock; that said income bonds may be declared fraudulent and void.

That the board of directors of the said Macon and Brunswick Railroad Company, elected by said preferred stockholders, and who are a majority of said board, are required to be the owners of two hundred shares of said preferred stock, be restrained from executing the office of directors, and that said railroad with all of its property, and franchises be turned over to a Receiver, to act and manage the same under the laws of this State, until the further order or decree of this Court on the merits of this bill. That said preferred stock

shall be scaled to its appropriate value, if anything has been actually paid for it, and common stock issued in its place; that said Macon and Brunswick Railroad shall answer and set forth what has been the income of said road since the same has been accepted from the contractors, what has become of said income, and how much of said income or other assets of said company have been applied and used in the construction account of said railroad; to whom said preferred stock was issued, and when and for how much, who owns and votes the said stock, and how much was paid for it; and that said Macon and Brunswick Railroad Company, may submit in answer to this bill, a complete financial statement of its affairs and business.

Hazlehurst was regularly served with this amendment. The Macon and Brunswick Railroad was served with the bill and amendment, but the amendment was not served on the other parties.

When the time for hearing came, Hazlehurst objected to the hearing because none of the defendants but himself and the Macon and Brunswick Railroad Company had been legally served. The Chancellor ordered the cause to proceed.

He and the Macon and Brunswick Railroad Company then demurred to the bill upon the following grounds:

1st. Complainants have a complete remedy at law. 2d. The Directors of the Macon and Brunswick Railroad Company are necessary parties to the bill. 3d. No substantial relief is prayed against any resident of Bibb county. 4th. The bill is multifarious. 5th. Such a bill cannot be sustained by a minority of the stockholders of the corporation. 6th. The wrongs can be redressed by the stockholders, and therefore equity has no jurisdiction. 7th. All relief prayed for is against non-residents, whose appearance cannot be compelled. 8th. The Court has no jurisdiction over the matters touching their dealing with State officials. 9th. The bill does not make a case for discovery or relief.

The Chancellor overruled the demurrer on all the grounds. {Hazlehurst and the Macon and Brunswick Railroad Company for further cause then filed Hazlehurst's individual answer to said bill, which was substantially as follows:

The making of the contract and the alleged legislation were admitted. He said that the extracts from his reports were garbled and unfairly presented the cause; said the company was heavily indebted in the winter of 1865, and its prospects were gloomy in February, 1866, and appended copies of said reports to show what he represented was true. He said that in December, 1866, State bonds were selling at ninety-seven and a half per cent. and believing they would so continue the company incurred heavy indebtedness for material, etc., but by the time these materials arrived, political causes, etc., had so depressed the bonds that the company thought of forfeiting the bonds rather than break faith with the State. In February, 1868, the State bonds were worth but about sixty per cent. and the company's bonds, indorsed by the State, were worth but from fifty to sixty cents in currency. At this juncture the stockholders met and were put fully in possession of all the facts in the premises by a printed report exhibited to this answer. In view of all the facts the stockholders then and there resolved that the directors should call on the stockholders for cash to pay these debts, if it did not take over ten per cent. on the stock; or lease the road to such parties on such terms as they thought best, or to do what else they might think best to relieve the company from the present distress.

Hazlehurst, in his report, had recommended the additional assessment as aforesaid. This the directors refused. He then tried to lease the road both to the Central Railroad and Banking Company and to the Macon and Western Railroad Company, but neither would lease it. He then made said contract. It was executed after it had been scrutinized by the board of directors and unanimously approved by them. It is an admirable contract, by which the contractors lost

money and the stock was increased in value fifty per cent. This contract was embodied in his report for February, 1869, and was approved by an unanimous vote of the convention of stockholders, all being familiar with its terms before the convention met. White knew every step taken towards its consummation, and was anxious that it should be made, that the Macon and Western Railroad Company might have a coast outlet, and be independent of the Central Railroad and Banking Company, and White bought most of his stock after he learned that this contract would be made. He said that a majority of the board of directors resided in Georgia. He said that no portion of said preferred stock was delivered until the work for it was done, but it was only placed with Dabney, Morgan & Company as trustees.

He admitted that the road was received before it was completed according to contract, but said that, while it fell short in some particulars, it was better than the contract required in others. These he specified. He insisted it was better than Southern roads generally are when new, and that the accidents on it were not greater than on other roads, and that most of those which had happened were on the parts of the road not built by Hull and Miller. He said he received the road upon his individual responsibility, without consulting any one, deeming the possession of the road sooner than by contract it could have been had, better than waiting and trying to compel its completion according to contract. And he appealed to specified cost of furnishing it and its income to justify his action. His reasons were fully detailed in his report to the stockholders' convention, in February, 1870, and they passed a resolution thanking him for his action. White was present. He said the five thousand shares of stock of the Macon and Western Railroad Company was bought by certain of the preferred stockholders of the Macon and Brunswick Railroad Company in New York, and that income bonds were issued to the holders to the extent of $200,000 00. White represented that this purchase would secure to the

Macon and Brunswick Railroad Company the through business of the Macon and Western Railroad Company, and prevent the Central Railroad and Banking Company from buying said stock and controlling the Macon and Western Railroad Company. The Macon and Brunswick Railroad Company was offered this stock at its cost, but could not pay for it, and its board, a majority resident in Georgia, resolved to issue said income bonds. He admitted that he urged and White opposed the passage of said Act, giving aid to the extent of $600,000 00, but said the Macon and Brunswick Railroad Company never spent a dollar to secure it, nor did he make any such promise as is averred with respect to its use. He said White offered to cease his opposition to said bill and the Macon and Brunswick Railroad Company, if Jessup *et al.*, would buy his stock in the Savannah, Griffin and North Alabama Railroad. He said, said bonds were issued and were in New York to pay the company's floating debt and retire its bonds.

He said the State, through its proper officers, having passed upon the matter and indorsed the bonds, complainants could not aver a violation of the law. He denied that any donations of said land, etc., had been transferred to Hull and Miller. He said the issue of $150,000 00 common stock to Dabney, Morgan & Company was for a *bona fide* debt due them, and was issued before said contract was made, and had no connection with it, and was received at a price over double its market value. He said that said non-residents owned besides their interest in his company, over $2,000,000 00 in the Macon and Western Railroad Company, and other stocks, etc., in Georgia, and Jessup holds the notes of the Savannah, Griffin and North Alabama Railroad Company for over $100,000 00. He averred that White was president of both these last named railroads, had bought stock in the Macon and Brunswick Railroad Company greatly below par, and was making this fight from ill will to Jessup and the Macon

and Brunswick Railroad Company. And he answered the interrogatories in detail.

In rejoinder to this answer, complainants read the affidavits of two engineers to sustain their charges as to the incompleteness of said road when Hazlehurst received it from Hull and Miller. They also read an affidavit of White, in which he stated as follows: In February, 1870, Hazlehurst read his report in manuscript, and when asked why he had received the road in an unfinished condition, stated, upon his honor, that it was the best finished new road he had ever seen built. He was then asked a statement of the financial condition of the company to know how the road was paid for. He promised to furnish a printed statement in thirty days, saying he would have had it then but for the sickness of his treasurer. All this was in public meeting, and yet the statement is not yet made. In the election for directors, M. K. Jessup & Company held proxies and voted. $1,500,-000 00 of the preferred stock, and four non-resident directors were present. He said that he was informed by one of the directors that the $200,000 00 income bonds were issued to the preferred stockholders to induce them to buy said five hundred thousand shares of the Macon and Western Railroad Company, and hold it for a certain period.

After argument, the Chancellor enjoined Hazlehurst and the Macon and Brunswick Railroad Company from delivering to Hull and Miller and their associates, the $600,000 00 of bonds indorsed or to be indorsed by the State under the said Act of 1870, from transferring or allowing to be transferred on their books said $1,500,000 00 of preferred stock until further order, and enjoined Hull and Miller and their associates from transferring said preferred stock or the $200,-000 00 of bonds of the Macon and Brunswick Railroad Company, endorsed by the State, the injunction to issue upon complainants giving bond for damages for $50,000 00.

Defendants say the Chancellor erred in proceeding in said cause before service was perfected as aforesaid; in overruling said demurrer and in granting said injunction.

Hazlehurst *et al.*, *vs.* The Savannah, etc., Railroad *et al.*

WHITTLE & GUSTIN, NESBITS & JACKSON, for plaintiffs in error.

LYON, DEGRAFFENRIED & IRVIN; B. HILL, for defendants. The service on the non-residents was "sufficient notice:" Act 29th October, 1870. Minority may ask injunction when corporation acts *ultra vires:* 40 Georgia Reports, 582, 617, 625, 626, 627, 643; 37th, 644. Charter allows no *preferred* stock; *ergo*, it could not be issued: 5 Georgia Reports, 567; 7th, 221; 8th, 23; 9th, 213; 40th, 627; see Charter, Acts 1856, 181; 1857, 71; 34th Eng. Ch., 347; Grant on Corp., 200. Contract incomplete, Hull and Miller must stand on *quantum meruit:* 18 Georgia Reports, 366; 28th, 196. Acceptance does not estop minority if acts are *ultra vires:* 27 Eng. Ch. R., (7 Hare,) 113, 129, *et seq;* Redfield on Railways, 495, 497; 1 Stockton's Ch. R., 401; 2 Russ and Mylne, 470; 5 Eng. Railway cases, 565; 6th, 222, 382; 13 Beavan, 1. Over issue of stock may be enjoined: 8 Georgia Report, 291; 16 Conn. R., 593; 2 Sandf. Ch. Reports 257; 17 Ohio Reports, 187. The bill is not multifarious: 27 Georgia Reports, 92. As to notice to the non-residents of the contents of the charters, etc.: 2 Redfield, 451; 3 Kernan, 599; 40 Georgia Reports, 582, 634.

McCAY, Judge.

1. We think the Judge was right in overruling the demurrer. There is clearly equity in the bill. There is a distinct charge of fraud and combination between Mr. Hazlehurst and the contractors, in the receipt of the road in an unfinished condition, and in the issue, without authority and fraudulently, of common stock. There is also equity in the prayer that the directors shall be restrained from purchasing the shares in the Macon and Western Railroad. But overruling the demurrer is one thing and granting the injunction is another. Judge Cole has, as we think, properly restrained the directors from purchasing the Macon and Wes-

tern stock.   From his refusal to appoint a Receiver, and his denial of all the other prayers of the bill as to the contract and receipt of the road, and as to the common stock, and the confining of his injunction to the *transfer* of the *preferred stock,* we must conclude that he felt the charges of fraud to be either completely repelled, or that the complainants had by their acquiescence estopped themselves. As we understand his judgment, he has restrained the transfer of the preferred stock, on the sole ground that the issue of such stock was *illegal,* and that such being the case, acquiescence or even consent by the stockholders could not cure the illegality.

2. In this we think there was error.   There is nothing in the charter prohibiting either the issue of preferred stock, or the other part of the agreement which stipulates that a majority of the directors shall be the holders of a certain number of shares of this stock.  As to the latter point, the qualification of directors, nothing is more common in corporations than to pass a by-law fixing qualifications for directors, as that they shall be the holders of certain shares of stock.

This charter provides that the directors may make by-laws; and if they have power to make a by-law, we can see no reason why they have not power to *contract* that a certain by-law shall exist.  As we have said, there is nothing in this charter *prohibiting* the issue of preferred stock.   It is contended, it is true, that the provision of the charter fixing each share at $100 for the amount paid in, prohibits the issue of preferred stock by implication.   We do not feel called upon in this case to decide this question.   We are inclined to the opinion that if there be no express prohibition against such issue in the charter, a corporation has power to issue such stock, keeping within the *amount* of stock limited by the charter.   It is, in fact, only one mode of borrowing money, and it would largely, and we think unwisely, cripple the efficiency of corporations to deny them this mode of offering security to those dealing with them.   The weight of authority is in favor of such a power: Redfield on Railways

2d volume, 516; 49th Maine, 491; 15th Indiana, 395. Though we admit the question is a new one, and the doctrines upon the subject are not well established.

3. The record in this case shows that this contract, both for the issue of the stock, and as to the qualification of directors has been acted upon by the contractors. The contract was reported to the company and it was acquiesced in. The contractors, on the faith of it, have built the road. And the question is, not whether the directors had power to make it, but whether, after it has been made, after the company has, upon its part got the benefit of the contract, after the other parties have, upon the faith of it, spent their money, and the company has acquiesced in the act of the directors, either the whole company, or a portion of the stockholders, can come forward and repudiate the contract?

Admitting the want of power in the officers to make the contract, can the company, or a portion of it, under the circumstances set forth, *now* repudiate it as *ultra vires?* Without doubt, there is an apparent conflict in the authorities upon this subject. It would seems from many cases, that an act *ultra vires*, by the officers of a corporation, is void, and that no amount of consent or acquiescence by the stockholders can estop them from setting up the illegality: 7 E. L. & E., 509; 35 E. L. & E., 8; 16 E. L. & E., 180; 22 Conn., 502; 21 Howard, 442; 12 E. L. & E., 224. On the other hand, it has often been held that the company or the stockholders may be estopped, like individuals, by consent, acquiescence, etc.: 30 E. L. E., 120; 35 Id, 37; 22 N. Y., 358; 17 Barb., 38; 5 El. & Bl., 248; Redfield on Railways, volume 1, 75; 14 Penn. St. R., 81; 23 Howard, 381; 4 John Chan., 370; 11 Eng. L. & E., 442; 24 Barb., 375; 9 Col., 45; Pierce on Railroad Law, 401; 19 Barb., 568; 6 Ohio, 119; 1 English Railway cases, 436; 2 Id, 187; 6 Allen, 52; 28 Georgia, 117. Upon a close examination, however, of the authorities, it will be found that this conflict is, for the most part, only apparent.

Every charter is a contract between the public and the corporators, and between the corporators themselves. An act of the officers (and a corporation can act in no other way) may violate the contract with the public. According to the authorities, such an act is an illegal contract, contrary to public policy, and void. But if the act only violate the contract between the corporators, it may or may not be void, accordingly as the corporators may have directed, assented to, or acquiesced in it. The former class of acts includes those which relate to enterprises or franchises not granted. The latter class includes such acts as violate those provisions of the charter which regulate the rights of the corporators with each other. It is apparent that there is a wide difference in the nature of things between these two classes of acts.

The officers of a corporation may do an act which is, under the charter, beyond the legitimate scope and province of the grant, as if a railroad company should undertake to build a cotton manufactory, or a bank to build a railroad. Such an act would be an attempt to exercise a *franchise* not granted to the corporation. There is strength in the argument that such an act is *illegal*, contrary *to public policy*, and however parties may have consented, they may ask the Courts to refuse to enforce contracts based upon or in furtherance of it. If by consent the stockholders could give validity to contracts based upon such acts, they could, in effect, grasp new franchises from the public at their pleasure. But acts of the officers of a corporation are often said to be *ultra vires* when they are wholly within the scope of the franchise granted in the charter, but they are beyond the authority conferred upon *the officers*.

Such acts, though directly contrary to the provisions of the charter, if they be authorized by the stockholders, or be acquiesced in, or confirmed, cannot be avoided after third persons have acted upon them. They are regulated by the rules which govern the relation of principal and agent to third persons: 4 John. Chan., 370 ; Pierce on Railroad Law, 401.

Applying these principles to the facts of this record, what is the result? The contract for the building of the one hundred and fifty miles of unfinished road was reported by the president to the stockholders' meeting; these complainants were present. It is true the bill states that the president did not go into details, and that there were provisions of the contract, which, if the complainants had known, they would not have assented to. But it is admitted in the bill that they were distinctly informed as to *the preferred stock.* It is also *stated in the bill*, that the president did not pretend to state the details of the contract, or do more than give its general features. The whole thing was there for their inspection. It is not charged that there was any deception, much less that the contractors deceived them. If the complainants did not know the terms of the contract, it was simply because they did not care to know; five minutes reading of a paper, at the call of any stockholder, would have told them the exact truth. They saw fit not to read, to be satisfied with what was avowedly only a general statement of it to them by their own agent. Would it not be monstrous, after the contractors have done the work, to permit men, thus acting, to come forward and repudiate their own contract? The provision of the charter fixing the stock at $100 00 per share, and implying equality between the shareholders, is clearly a matter in which the public, as such, has no interest. It is simply a regulation looking to the internal management of the affairs of the company, to the rights of the stockholders among each other. So, too, as to the qualification of directors. The company may make any rule on that subject they see fit. If so they may contract to do it, and if they receive the consideration they cannot say the contract was *ultra vires.*

These things are, even if they be provided for in the charter, mere contracts among the stockholders for the regulation of their rights as to each other; they are contracts, too, which any one stockholder has a right to insist upon, even

against every other. But if there be a dealing with third persons, in which the stockholders acquiesce, or which they confirm, they cannot plead, when they are called on to comply with their contract, that it was *ultra vires.* We think, therefore, that as to *the contract*, even as the facts are stated in the bill, it is too late now for the complainants to set up *ultra vires.*

4. As so the question of fraud in the receipt of the road, we agree with Judge Cole, that the answer of Mr. Hazlehurst, with the printed annual reports attached, completely deny it. We think, too, that here, also, the acquiescence of the complainants for a year and their receipt of the profits, estops them. It was the *contract* that Mr. Hazlehurst should be the judge of the acceptance of the road, and the whole point of the charge is, *fraud* upon *his* part. If he was *incompetent*, if his *judgment was bad*, he was still the agent of the company. It is only the charge of fraud and complicity which gives vitality to this part of the bill. That, it seems to us, is completely denied. No matter if the road was incomplete. If, in the judgment of the president and engineer of the company, in good faith entertained, it was to the interest of the company to receive the road, and he has done it, and the company has, for a year, uncomplainingly acquiesced, they are estopped. They cannot now put the contractors where they were, and it would be a gross wrong to permit them at this late day to object. It is a well settled principle, that when work is to be received or not, according to the judgment of an engineer, his decision is final, unless there be fraud: 1 Redfield on Railways, 406, 416.

5. Upon the question of the right of the directors to purchase the stock of the Macon and Western Railroad, we abide by the decision made in the case of *The Central Railroad vs. Stephen Collins*, decided at December Term, 1869. We think the cases precisely parallel. If one railroad comany may, at its option, buy the stock of another, it practi-

cally undertakes a new enterprise, not contemplated by its charter· This it cannot do by any implication. The power so to do must be clear, and that, too, under the rule of construction that the charter is to be strictly construed as against the power. The power granted by the Act of 1860, pamphlet 193, to hold any kind of property, can only mean any kind of property necessary to carry out the purposes of the franchise, to-wit: the building and working a railroad from Macon to Brunswick. The purchase of *this* stock would be, and could be, only for the purpose of exercising a *new franchise*, to-wit: the running of a road ·from Macon to Atlanta. We do not care to go over the argument we have used in the case referred to. We simply say we see no reason to change the doctrine there. stated, and that there is nothing in the Act of 1856 or of 1860 broader than was in the charter of the Central Road. We take occasion to say that, in our judgment, the use of the State indorsed bonds for this purchase would be illegal. The purpose of the State was clearly not to aid the Macon and Brunswick Railroad in constructing the Macon and Western Railroad, but to complete and equip its own road.

6. Any stockholder has a right to insist that the bonds thus indorsed shall be, in good faith, used for the purpose intended by the State.

7. But we do not see how it is possible for a Chancellor, in this State, to enjoin a non-resident who has not been served with process by some officer of this State, from doing an act in the State of New York: Dearing *vs.* Bank of Charleston, 5 Georgia, 427; Adams *vs.* Lamar, 8 Georgia, 82; 1 Daniel Chancery Practice, 502. We greatly regret that this is the case. These bonds have been illegally used, and we should be very glad to lay our hands upon them. But the desire to do this cannot change the settled law of the case. Unless the parties can be served by some process, our Courts cannot control them by injunction. We do not say that there is no remedy for this wrong. These men hold property in

Georgia, in this road, and any claim a citizen of Georgia has against them may, without doubt, follow that property. Clearly, also, the stockholders have a right to see to it, that the sinking fund provided for by the Act of 1865, indorsing the bonds, shall be set aside, as that Act requires. But there is no allegation in the bill that the company *refuses* to do this. The bill charges that it has not been done. Perhaps these very complainants have voted against doing so.

Courts will not, as a general rule, interfere between the stockholders and a corporation, until the methods in the power of the stockholders have been tried. It is not charged in this bill that any person has sought to have this fund set aside. Perhaps if a motion to that effect were made it would be done : Redfield on Railways, volume 2, 325 ; 4 E. L. & E., 113 ; 2 Hare, 461 ; 49 Penn., 310. We think this ought to be done. If none of the stockholders will move it, we hope the State authorities will interfere and demand it, and if it is refused, we hope steps will be taken to compel it. These State indorsements are full of danger to the State, unless the law be very faithfully complied with.

Judgment reversed.

LOCHRANE, Chief Justice, concurred from the Bench as follows :

It appears from the record in this case, that defendants in error filed their bill charging several acts done by the Macon and Brunswick Railroad Company; to be *ultra vires,* and others as fraudulent, and injurious to the rights of the minority stockholders, who are the complainants. Their grounds of complaint are : 1st. In relation to a contract made with Hull and Miller for the completion of the road to Brunswick. 2d. That preferred stock had been issued to them in payment. 3d. That such stock it had been agreed should form the qualification for directorship in the company. 4th. That the contract has not been fulfilled. 5th. That the directors have issued $200,000 00 in bonds as a *bonus* for the purchase of

certain shares in the Macon and Western Railroad Company.

To this bill there was a demurrer, which was overruled, and the answer of the president of the company was then filed, upon which the hearing took place, and the Judge below, in Chambers, March 20, 1871, ordered that the defendants, George Hazlehurst and the Macon and Brunswick Railroad Company, be restrained and enjoined from delivering the $600,000 00 in indorsed bonds, etc., also from transferring the preferred stock upon the books, etc.; also he enjoined and restrained the parties (non-residents) who hold the preferred stock from disposing of it, and also the $200,-000 00 bonds which they hold, and this judgment (1st) in overruling the demurrer, and (2d) in granting the injunction as stated, is now before *us* and forms the basis of this writ of error.

We do not propose to go through this record in giving the reasons of our concurrence in the opinion delivered by the Court. Nor is it necessary in the view we entertain of the only question of importance in the case. The demurrer was, we think, overruled properly by the Court below upon the ground that the use of the two hundred thousand bonds, to buy the stock of the Macon and Western Railroad Company was *ultra vires*, and the proper subject matter of equity interposition and jurisdiction by the Court. The other charges of the bill give no right to the complainants, as minority stockholders, to invoke the jurisdiction of equity without reference to the *answer*, which is complete, conclusive and overwhelming in its effect, responsive to the allegations. We feel satisfied, that the corporation in making this contract did not exceed its duty, that the right to issue preferred stock or income bonds, or mortgage bonds, with which to pay for the construction of a railroad, is a clear and unquestionable right under the corporate powers incident to all corporations. And in view of the great benefit to the public, by permanent investments in railroads in this State, we lay down the proposition broadly that such right may not fur-

ther be made a question of judicial controversy. In the wisdom of the legislative power grants of charter privileges have been conferred for the purpose of building additional roads throughout the limits of this State, and State indorsement superadded to induce the consummation of such enterprises. When such roads are built they contribute largely to advance the public interests, and while this Court will hold the strict accountability of the use of such State indorsement by such corporators, we will recognize the right of such companies to enter into such contracts as will secure the construction of these respective roads within the proper exercise of these corporate powers either express or implied, as essential to consummate the purposes of their creation. We therefore hold that, neither in the making of the contract or issuing preferred stock to the contractors, was there anything done which would not be legally done within the legimate scope and power of their charters. Nor do we see any equity in the allegations that this road was not completed according to contract, under the facts. This question was settled finally and firmly by the acts of the officers of the company and the approval of the stockholders. Nor is there anything *ultra vires* in the twelfth section of the contract relating to the qualifications of directors. These directors had the power to make the by-laws and to make the contract, and the approval of both ends the question as to these complainants. But we think that the use of the $200,000 00 in bonds as a fund to purchase the stock of another road was *ultra vires*, and not authorized by the charter. And the injunction as to this was properly granted. But as to all other things ordered therein it was improperly granted. Remarking that injunctions against non-residents can bear no extra territorial force, and should not be granted by Courts, we reiterate the opinion of this Court at the present term. It is only in a strong case and when the majority are clearly violating the chartered rights of the minority and putting their interests in imminent danger, that a Court of equity will, at the in-

stance of a minority of the stockholders in a corporation, interfere with the management of its affairs.

WARNER, Judge, dissenting.

This is a bill filed by the complainants as stockholders in the Macon and Brunswick Railroad Company, against the company, alleging that they are the holders and owners of seventeen hundred and forty-four shares of the capital stock of said company, which has been *bona fide* paid to said company at the rate of $100 00 per share, and that their interest as such stockholders in said company is greatly endangered by the illegal conduct of the president and board of directors of said company in violation of the charter thereof, with a prayer for relief and injunction. The complainants allege, amongst other things in their bill, that their company, in direct violation of their charter, which provides that the stock of said company shall consist of a certain number of shares, to be subscribed and paid for at $100 00 per share, have made a contract whereby they have issued $1,500,000 00 of *preferred* stock, which was estimated and valued at the sum of $300,000 00 only; that this *preferred* stock was issued for the purpose of enabling the holders thereof to obtain the control of the affairs of the company, to the injury of the *bona fide* stockholders thereof, inasmuch as it is provided in said contract that a majority of the board of directors shall each be a holder of two hundred shares of said *preferred* stock, and that such directors shall be elected as soon as there are parties qualified to serve; that said company shall not increase the further issue of bonds, or the common or preferred stock of the company, *except by consent in writing of a majority in amount, of the holders of the preferred stock.* The complainants further allege and charge in their bill that the company, after having obtained the State's aid by an indorsement of their bonds for $10,000 00 per mile to enable them to build their road, and after they had

Hazlehurst *et al.*, *vs.* The Savannah, etc., Railroad *et al.*

been running their trains thereon for several months through to Brunswick, obtained from the State additional State aid, by an indorsement of their bonds to the extent of three thousand dollars per mile, under the pretext that it was wanted for the purpose of paying off $1,100,000 00 of the second mortgage bonds of the company, whereas the contrary thereof is the truth; that it never was the intention of said company to extinguish any part of said indebtedness held by themselves, but to retain the $600,000 00 of the State's indorsed bonds, for the use and benefit of said *preferred* stockholders, to the *exclusion* of the complainants and other stockholders in said company. It is further alleged and charged in said bill that notwithstanding said company has received the State's indorsed bonds, on the representation that the road had been completed so as to entitle the company to receive the same; yet, in fact, the road has not been so completed, but is still in an incomplete and unfinished condition, rendering it not only unsafe, but dangerous as a highway of travel, and thereby exposing the complainants, as stockholders in the road, to heavy damages for loss in running trains over such a defective road. The bill alleges especially the defects in the construction of the road, which is supported by the affidavits of two engineers who worked on it at the time of its being constructed. The bill also alleges and charges that the directors of said company, made such by virtue of said *preferred* stock, have purchased five thousand shares of the stock of the Macon and Western Railroad Company on their own *private account*, and not for the Macon and Brunswick Company, and have paid therefor in the Macon and Brunswick State indorsed bonds. The bill further charges that a majority of the said *preferred* stockholders are *non-residents* of this State; that their interests are in conflict with the interests of the original *bona fide* stockholders in said company; and that the holders of such *preferred* stock, under said illegal contract set forth in the bill as an exhibit thereto, are enabled to control the management of said company, and the

financial affairs thereof as they may desire; and that said company has not set apart annually, and deposited with the Governor, two per cent. upon the amount of the bonds indorsed by the State, as a sinking fund, for the payment of said bonds, as required by the Act and resolutions granting the aid of the State to said company.

After hearing the parties by their counsel on the application for an injunction, the Judge granted the same, whereupon the defendants excepted.   The contracts made by corporations, within the limits of their respective charters, as well as those of natural persons, are under *the protection of the law*, and it is the duty of the Courts to maintain and enforce them; but when incorporated companies undertake to make contracts or do other acts *not authorized* by their respective charters, or in *violation* thereof, then it is equally the duty of the Courts to *restrain them*.   The allegations and charges made by the complainants in this bill against the President and Directors of the Macon and Brunswick Railroad Company, are, to speak in the mildest terms, of a very grave character, and it is due to them, as well as to the public, that they should have an opportunity to meet them, not by *sharp, technical* objections, but *squarely* on the merits thereof, on the final hearing before the proper tribunal.   If a railroad corporation can be allowed, without express authority granted to it for that purpose, to make a contract by which they can provide for the issuing of *preferred* stock of the company, and prescribe thereby that the holding of a certain number of shares of that *preferred* stock shall constitute a necessary qualification for a director in that company, without any regard to the amount to be paid for each share of such *preferred* stock, and thus obtain in that way the control of the affairs of the company, there will not be much security for the rights of the minority *bona fide* stockholders who have paid the full amount of their stock as required by the charter of the company; that is to say, $100 00 for each share of stock therein.   Although the State is not com-

plaining in this case, but only the stockholders of the company, still the principle involved is the same as if the State was complaining, and it is an *important principle* in view of the extent to which State aid has been granted to railroad companies in this State. The Act of the General Assembly granting State aid to this company, provides, that the indorsed bonds shall not be sold for less than ninety cents in the dollar, but if the company, as was done in this case, can make a contract by which they create *cheap preferred* stock, and then make a contract for the sale of the State's indorsed bonds *and the cheap preferred* stock to the same purchaser, though the indorsed bonds might be *nominally* rated at ninety cents in the trade, what would be the average price paid for the whole? How much *money* would the purchaser in fact pay for the cheap preferred stock and the State indorsed bonds? By this arrangement the strong indorsed State bonds as well as the original paid up stock are diluted and weakened by the company's *cheap preferred* stock, in the same manner as good, strong brandy is diluted and weakened by pouring into it plenty of water. If all the company's stock was such as required by its charter, $100 00 per share, and that amount *actually* paid in therefor, then that stock could not be used to dilute and weaken the value of the indorsed State bonds or the original paid up stock of the company, but the *cheap preferred* stock issued outside of the provisions of the charter could be so used. And it is charged in this bill that the $1,500,000 00 of the *preferred* stock issued by the company under the contract was estimated and valued at *only* the sum of $300,000 00, and that this latter amount was not actually paid in to the company in money, but was to be paid in work after the same was issued. The facts of this case illustrates the practical effect of a railroad company being allowed to issue *preferred* stock in a different manner from that which is prescribed by its charter. And the principle involved in this case is applicable to every other railroad in the State, and is especially important for the pro-

tection of the interests of the people in view of the extent to which State aid has been granted to the several railroad companies in this State.

There is another important principle involved in this case, of which the original stockholders in this company complain, and that is the indorsement of the bonds of the company by the State, when the road has been imperfectly built and in an unfinished condition. If the road is in the condition as stated in the bill of complaint, and the indorsement of the bonds was procured from the State for the benefit of the *preferred* stockholders in that company, then it was not only a legal fraud on the complaining stockholders, but a legal fraud on the people of the State. I say a legal fraud, because it was a fraud perpetrated under *the form* and *color* of law. It is true, the State is not complaining here now, but *the principle* applicable to railroads constructed with State aid, should not be *ignored*. The only security which the State has for her indorsement of the bonds of railroad companies is the roads and their equipments. If the State's indorsement shall be procured on the bonds of a half finished or improperly constructed road, the bonds sold, and the money arising therefrom in the pockets of unknown persons, and the road is sold on the foreclosure of the State's mortgage, such a road might not, and probably would not sell for enough to pay the debt due the State, but the bonds would have to be paid by taxation of the people. The facts disclosed by this record shew what has happened in regard to this road, and what may and probably will happen in regard to other roads to which State aid has been granted, if the Courts fail to protect, by the exercise of that restraining process with which they are clothed when corporations undertake to make contracts and do other acts not authorized by their respective charters, or in violation of the Acts of the General Assembly, granting to them State aid by the indorsement of their bonds.

The purchase of the five thousand shares of stock of the

Macon and Western Railroad by the directors of the Macon and Brunswick Company, on their own private account, and paying therefor with the indorsed State bonds of the latter company, in the manner and for the purpose as charged in the bill of complainants, was unauthorized and illegal as against the rights of the complaining stockholders. The appropriation of $600,000 00 of the State indorsed bonds by, and for the use of the *preferred* stockholders, to the *exclusion* of the complainants and the other stockholders of the company as charged and set forth in complainants' bill, was unauthorized and illegal as against the rights of the complaining stockholders of the company. I am, therefore, of the opinion that the judgment of the Court below granting the injunction in this case should be affirmed.